**N&N CATERING COMPANY, INC., Plaintiff,**

v.

**CITY OF CHICAGO, and Board of Election Commissioners of the City of Chicago, Defendants.**

**No. 98 C 6961.**

United States District Court, N.D. Illinois, Eastern Division.

Dec. 2, 1998.

J. Brian Pierce, J. Brian Pierce & Associates, Chicago, IL, James Frederick Carlson, Law Offices of James F. Carlson, Chicago, IL, for N&N Catering Company, Inc., plaintiff.

Patrick Walter Johnson, City of Chicago, Law Department, Corporation Counsel, Chicago, IL, Ralphette Gaston Rhodes, Norma Reyes, Scott A. Frey, City of Chicago, Department of Law, Chicago, IL, for James Laski, defendant.

James Michael Scanlon, James M. Scanlon & Associates, Chicago, IL, for Board of Election Commissioners of the City of Chicago, defendant.

### OPINION and ORDER

NORGLE, District Judge.

Plaintiff N & N Catering Company ("N & N") seeks a preliminary injunction enjoining enforcement of a referendum passed pursuant to the local option provision of the Illinois Liquor Control Act ("Liquor Control Act"), 235 ILCS 5/9–2. If operative, the referendum will void N & N's liquor licenses effective December 3, 1998. For the following reasons, the court issues a preliminary injunction.

### I. BACKGROUND

N & N holds state and city licenses authorizing it to sell alcoholic beverages for on-premises consumption at 4220 S. Halsted in Chicago. Though N & N does not state so, it is important to note from the outset that 4220 S. Halsted is the address of a Chicago landmark: the International Amphitheatre ("the Amphitheatre"). In its heyday, the Amphitheatre was the site of five national political conventions (the most recent being the 1968 Democratic convention), world championship boxing matches, and major music concerts (Elvis in 1957, The Beatles in 1964). *See* John Kass, *Daley Wants to Buy, Raze Amphitheatre,* Chicago Trib., October 9, 1996 (Metro Chicago section), at 3, 1996 WL 2715347; Robert Davis, *Amphitheatre Comes Back From Oblivion,* Chicago Trib., November 27, 1987, (Chicagoland section), at 1, 1987 WL 2999569. By the early 1980s, however, the Amphitheatre ceased attracting prime events due to increased competition from newer, modern venues. *See id.* After closing in 1983, the Amphitheatre re-opened in 1987, and now is the site of "less popular" events such as rodeos and flea markets. *See id.*

In July 1998, certain residents of the precinct surrounding the Amphitheatre initiated a campaign to prohibit the sale of alcohol at the venue. Pursuant to the local option provision of the Liquor Control Act, 235 ILCS 5/9–2, those residents began circulating petitions that would allow precinct voters to decide, via referendum, whether to prohibit the sale of alcohol at the Amphitheatre. The petition read, in relevant part:

To the City Clerk or the City of Chicago, Illinois:

The undersigned, residents of the *35th* Precinct of the *11th* Ward of the City of Chicago, County of Cook, State of Illinois, respectfully petition that you cause to be

submitted in the manner provided by law, to the voters thereof, at the next election to be held on November 3, 1998 the proposition:

"Shall the sale at retail of alcoholic liquor be prohibited at the following address:

*4220 South Halsted Street, Chicago, Illinois*"

*See* 235 ILCS 5/9–2, 9–4.

By August 4, 1998, the petition included the "signatures of not less than 40% of the legal voters" residing in the precinct, thereby requiring the Clerk of the City of Chicago to take the necessary administrative steps to place the referendum on the November 3rd ballot. *See* 235 ILCS 5/9–2, 9–10.

N & N, however, sought to prevent the referendum from being placed on the November ballot. On October 8, 1998, N & N filed suit in state court against James Laski ("Laski"), as Clerk of the City of Chicago, and the Board of Election Commissioners of the City of Chicago ("the Board of Election"). In its complaint, N & N challenged the validity of the petitions, see 235 ILCS 5/9–4, 9–19, and alleged that the Liquor Control Act deprived it of due process of law. (*See* Defs.' Resp. at 1, 10.)[1] On October 21, 1998, the Circuit Court of Cook County dismissed the suit, concluding that "[t]he failure of the Plaintiffs in this cause to file a bond for costs within the time prescribed by 235 ILCS 5/9–4 deprives this court of jurisdiction to hear this cause." (*Id.*, Ex.1.) On October 30, 1998, the Illinois Appellate Court issued an order affirming the trial court's decision. (*Id.*, Ex. 2.)

On that same day, N & N filed a six-count complaint in federal court under 42 U.S.C. § 1983, again naming Laski and the Board of Election as defendants. In short, N & N alleges that the local option provision of the Liquor Control Act, 235 ILCS 5/9–2, violates its rights under the United States and Illinois constitutions. Accordingly, N & N moved for a temporary restraining order to enjoin Laski and the Board of Election from

placing the referendum on the November 3rd ballot. On November 2, 1998, however, N & N withdrew its motion, and the court ordered this matter certified to the Attorney General of the State of Illinois pursuant to 28 U.S.C. § 2403(b).[2] *See also* Fed.R.Civ.P. 24(c); *Perez v. City of Chicago*, 95 C 685, 1995 WL 410981, at *6 (N.D.Ill. July 10, 1995).

The referendum was placed to a vote on November 3rd. The final voting tally was 178 in favor of passing the referendum and 88 against. Put another way, 67% of the ballots cast in the 35th precinct indicated that voters wanted to prohibit the sale of alcohol at the Amphitheatre. The passage of the referendum thus voided N & N's licenses to sell alcohol at the venue. *See* 235 ILCS 5/9–2.

As provided in the Liquor Control Act, the results of the referendum "become operative on the 30th day after the day of the election at which such vote is cast." 235 ILCS 5/9–3. Here, that operative date is December 3, 1998; voters in the 35th precinct will not have the opportunity to reconsider the prohibition for another four years. *See* 235 ILCS 5/9–11 (stating that a specific local option referendum cannot be resubmitted to the voters until 47 months have passed since the last referendum).

The election having gone forward, N & N no longer had a viable action against Laski and the Board of Election as real parties in interest. Therefore, N & N moved to substitute the Director of the Local Liquor Control Commission, an official of the City of Chicago responsible for enforcing the results of the referendum, as a defendant in place of Laski. *See* 235 ILCS 5/4–2, 4–6. After a hearing in which the parties debated whether the Local Liquor Control Commission is a suable entity, the parties agreed that the City of Chicago ("the City") is the real party in interest here. Though the Board of Election remains a defendant, it is unclear what, if any, claims remain against it.

---

1. N & N's state complaint is not included in the record.

2. Section 2403(b) provides:

   In any action, suit, or proceeding in a court of the United States to which a State or any agency, officer, or employee thereof is not a party, wherein the constitutionality of any statute of that State affecting the public interest is drawn in question, the court shall certify such fact to the attorney general of the State, and shall permit the State to intervene for presentation of evidence ... and for argument on the question of constitutionality.

Thus, N & N's complaint, as it currently stands, seeks declaratory and injunction relief solely against the City. Specifically, N & N alleges that the Liquor Control Act: (1) violates N & N's rights under the Fourteenth Amendment by depriving N & N of its liquor license without due process; (2) violates N & N's "rights to equal protection of the laws under the Fourteenth Amendment" by treating N & N differently from other similarly situated establishments within the 35th precinct; (3) violates the Bill of Attainder Clause of Article I, Section 10, of the United States Constitution by creating "a mechanism through which voters enact into law a provision which legislatively singles out an identifiable individual establishment for guilt and punishes it without the protection of judicial trial"; (4) creates an arbitrary and groundless distinction between the City of Chicago and all other municipalities within Illinois, thereby depriving licensees within the City of Chicago of equal protection of the laws under the Fourteenth Amendment; and (5) grants a special privilege and immunity to similarly situated retail establishments located outside the City in violation of the Special Legislation Clause, Article 4, Section 13 of the 1970 Illinois Constitution.

To those ends, N & N's prayer for relief seeks the following: (1) an order declaring the amended provisions of 235 ILCS 5/9–2 unconstitutional, invalid and void; (2) a preliminary, and ultimately permanent, injunction voiding the results of the November 3rd referendum and prohibiting its enforcement; (3) a preliminary, and ultimately permanent, injunction prohibiting the City from taking any adverse action against N & N in relation to the November 3rd referendum; and (4) reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

At the moment, however, N & N's memorandum in support of its prayer for declaratory and injunctive relief presents arguments as to only two of its claims: due process and special legislation. First, N & N argues that the Liquor Control Act denies it due process of law by allowing a precinct to vote a single licensee dry. (See Pl.'s Mem. in Supp. at 5–8.) Second, N & N argues that the Liquor Control Act "arbitrarily distinguishes be-

tween Chicago and other municipalities in Illinois, in violation of the Special Legislation Clause of the Illinois Constitution." (Id. at 8–11.) The City, in turn, filed a response in which it seeks to dismiss N & N's due process claim, arguing that "under Illinois state law a liquor license is not property, but rather a privilege to which the due process clause does not apply" (Def. Resp., at 5.) [3] The City also maintains that the Liquor Control Act does not violate the Special Legislation Clause of the Illinois Constitution.

As explained below, the court enters a preliminary injunction enjoining the impending enforcement of the November 3rd referendum on due process grounds; the City's motion to dismiss is therefore denied. Nonetheless, whether the court should enter a permanent injunction declaring the local option provision of the Liquor Control Act unconstitutional is left for another day. One compelling reason for declining to address that issue conclusively at this juncture is that the Illinois Attorney General has yet to indicate whether it will intervene in this action. See generally 28 U.S.C. § 2403(b); 15 ILCS 205/4 (outlining the duties of the attorney general); McCrimmon v. Daley, 418 F.2d 366, 368 (7th Cir.1969) (Illinois attorney general dismissed as defendant from action that challenged constitutionality of Illinois Liquor Control Act because the act was merely enabling legislation in which the Attorney General was not charged with its enforcement); Boussom v. City of Elkhart, 567 F.Supp. 1382, 1387 (N.D.Ind.1983) (declining to decide constitutionality of Indiana statute because, inter alia, Attorney General of Indiana was not notified). Additionally, federal courts are generally reluctant to declare state statutes unconstitutional, as state legislation is entitled to a presumption of constitutionality. See Dept. of Revenue of Mont. v. Kurth Ranch, 511 U.S. 767, 796, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994); Cohen v. City of Des Plaines, 8 F.3d 484, 489 (7th Cir. 1993); Andree v. Ashland Cty., 818 F.2d 1306, 1313 (7th Cir.1987). Thus, the court emphasizes that its decision is only preliminary, and is in response to the fast-approach-

---

**3.** The caption of the City's memorandum reads: "Memorandum in Support of Motion to Dismiss and in Response to Plaintiff's Prayer for Declaratory and Injunctive Relief."

ing enforcement date of the referendum. *See Vogel v. American Society of Appraisers,* 744 F.2d 598, 604 (7th Cir.1984) (emphasizing the preliminary nature of a preliminary injunction).

## II. DISCUSSION

### A. Preliminary Injunction

■ For a preliminary injunction to issue, a plaintiff must demonstrate (1) some likelihood, *i.e.,* only a better than negligible chance, of success on the merits, *see Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.,* 128 F.3d 1111, 1114–15 (7th Cir.1997), and (2) " 'an inadequate remedy at law and irreparable harm if preliminary relief is denied.' " *Brownsburg, Area Patrons Affecting Change v. Baldwin,* 137 F.3d 503, 507 (7th Cir.1998) (quoting *TMT North America, Inc. v. Magic Touch GmbH,* 124 F.3d 876, 881 (7th Cir.1997)). If the plaintiff fails to establish either of these elements, then the court's analysis "ends and the preliminary injunction should not be issued." *Adams v. City of Chicago,* 135 F.3d 1150, 1154 (7th Cir.1998). On the other hand, if the plaintiff demonstrates these elements, "then the court considers the irreparable harm to [the defendant] if preliminary relief is granted as balanced against the irreparable harm to [the plaintiff] if preliminary relief is denied, and the public interests involved." *Baldwin,* 137 F.3d at 507 (citations omitted); *see also Boucher v. School Bd. of Greenfield,* 134 F.3d 821, 824 (7th Cir.1998). The court uses a "sliding scale" approach to this balancing test; that is, "the stronger the case on the merits, the less irreparable harm must be shown." *Ty, Inc. v. GMA Accessories, Inc.,* 132 F.3d 1167, 1172 (7th Cir.1997) (citations omitted). "The balancing of the imponderables involved in the decision whether to grant or deny a preliminary injunction is a task calling for a judgment based on the particulars of the individual case." *Planned Parenthood of Wisc. v. Doyle,* 162 F.3d 463, ——, 1998 WL 787360, at *2 (7th Cir. Nov.3, 1998).

### B. Likelihood of Success

In deciding whether a preliminary injunction should issue, the threshold consideration is the plaintiff's likelihood of success on the merits. *See Platinum Home Mortg. Corp. v. Platinum Financial Group., Inc.,* 149 F.3d 722, 726 (7th Cir.1998). "Although the plaintiff must demonstrate some probability of success on the merits, 'the threshold is low. It is enough that the plaintiff's chances are better than negligible ....' " *Brunswick Corp. v. Jones,* 784 F.2d 271, 275 (7th Cir. 1986) (quoting *Roland Machinery Co. v. Dresser Indust.,* 749 F.2d 380, 387 (7th Cir. 1984)). The court now turns to whether N & N's due process claim meets that threshold.

■ "The Fourteenth Amendment protects persons from state governmental deprivations of life, liberty, or property without due process of law." *Pro–Eco, Inc. v. Bd. of Commissioners of Jay County,* 57 F.3d 505, 512 (7th Cir.1995). A procedural due process claim under the Fourteenth Amendment is brought pursuant to 42 U.S.C. § 1983, and "require[s] a two-step analysis." *Doherty v. City of Chicago,* 75 F.3d 318, 322 (7th Cir. 1996); *see also Greco v. Guss,* 775 F.2d 161, 170 (7th Cir.1985). First, the court must determine whether N & N has been deprived of a protected interest; second, the court must determine "what process is due." *Doherty,* 75 F.3d at 322. Two cases from the Seventh Circuit and one from this district are the primary guides in the analysis here: *Philly's v. Byrne,* 732 F.2d 87, 93 (7th Cir. 1984) (holding that local option referendum under the Illinois Liquor Control Act did not violate licensee's due process rights because it banned the sale of liquor precinct-wide); *Reed v. Shorewood,* 704 F.2d 943, 949 (7th Cir.1983) (stating that plaintiff's interest in renewal of an Illinois liquor license is a property right under the Fourteenth Amendment); and 87 *South Rothschild Liquor Mart v. Kozubowski,* 752 F.Supp. 839, 842 (N.D.Ill.1990) (declaring unconstitutional past version of local option provision in the Illinois Liquor Control Act because it singled-out a specific liquor seller). To the extent that the holdings in *Reed* and *Philly's* apply, they are of course binding.

1. *Whether N & N's Liquor License Is a Property Interest*

The Liquor Control Act provides that "[a] license shall be purely a personal privilege, good for not to exceed one year after issu-

ance ... and shall not constitute property, nor shall it be subject to attachment, garnishment or execution, nor shall it be alienable or transferable ... or subject to being encumbered or hypthecated." 235 ILCS 5/6-1. Despite the clear language of the statute, there appears to be a continuing difference of opinion among Illinois courts as to whether a liquor license is a property right or a mere privilege. *Contrast, e.g., Reed,* 704 F.2d at 948–49 (looking beyond the terms of the Liquor Control Act to conclude that a property right existed at least for some purposes) *with Black Knight Restaurant, Inc. v. City of Oak Forest,* 159 Ill. App.3d 1016, 111 Ill.Dec. 863, 513 N.E.2d 109, 111 (Ill.App.1987) (criticizing *Reed* and citing the Liquor Control Act and a line of Illinois cases which state that an Illinois liquor license is a privilege); *see also Esmail v. Macrane,* 862 F.Supp. 217, 225 (N.D.Ill. 1994), *rev'd on other grounds,* 53 F.3d 176 (7th Cir.1995) (recognizing that "there appears to be some dispute as to whether a liquor license is a property right under Illinois law"). The distinction is crucial, for the Fourteenth Amendment does not require due process for the deprivation of a privilege. Put simply, if N & N fails to show that its liquor license is property, its due process claim must fail.

Before turning to the parties' arguments, the court notes that it asked the parties at a prior hearing whether it is N & N's city or state license, or both, that is at issue. Counsel agreed that it was N & N's city license. In the briefs before the court, however, the parties provide arguments only in terms of N & N's state license. Although the city's liquor control ordinance would appear to be relevant to the court's "property" inquiry, *see Bayview–Lofberg's, Inc. v. City of Milwaukee,* 905 F.2d 142, 144 (7th Cir.1990), the court will proceed in terms of an Illinois liquor license that was granted pursuant to the Liquor Control Act. *Cf.* 235 ILCS 5/7-6 ("The revocation of a local license shall automatically result in the revocation of a State license."). *But cf. Esmail v. Macrane,* 862 F.Supp. 217, 225 (N.D.Ill.1994), *rev'd on other grounds,* 53 F.3d 176 (7th Cir.1995) (declining to address on a motion to dismiss whether plaintiffs had a property interest in

liquor license because parties failed to provide copy of local liquor ordinance.).

N & N argues that "[i]t is settled law in this Circuit that holders of Illinois liquor licenses enjoy property interests protected by the Due Process Clause." (Pl.'s Mem. in Supp. at 7.) In support of its argument, N & N relies on *Reed* and *Philly's.* The City, in turn, contends that *Reed* and *Philly's* are not controlling, and refers to the express language of the Liquor Control Act, 235 ILCS 5/6-1, and the following line of cases which state that an Illinois liquor license is a mere privilege: *Sapir v. City of Chicago,* 749 F.Supp. 187, 190 (N.D.Ill.1990) (Norgle, J.); *Ole, Ole, Inc. v. Kozubowski,* 187 Ill.App.3d 277, 134 Ill.Dec. 895, 543 N.E.2d 178, 181 (Ill.App.1989); *Ross v. Kozubowski,* 182 Ill. App.3d 687, 131 Ill.Dec. 248, 538 N.E.2d 623, 626 (Ill.App.1989); and *Black Knight Restaurant, Inc. v. City of Oak Forest,* 159 Ill. App.3d 1016, 111 Ill.Dec. 863, 513 N.E.2d 109, 111 (Ill.App.1987). The court's analysis begins with *Reed* and *Philly's.*

In *Reed,* officials of the Village of Shorewood, Illinois employed various tactics to strip the plaintiffs of their liquor license. *See* 704 F.2d at 947. Although the officials waged an unsuccessful campaign to revoke the plaintiffs' liquor license administratively via the Illinois Liquor Control Commission, they were successful in wearing down the plaintiffs to the point where the plaintiffs eventually closed their watering hole and surrendered their license. *See id.* The plaintiffs then filed suit against the village and its officials, alleging that the village and its officials "interfered with and eventually destroyed their business, in violation of the due process clause of the Fourteenth Amendment." *Id.* Of particular note was the plaintiffs' allegation that the defendants "wait[ed] for the license to expire and then refuse[d] to issue a renewal license." *Id.* at 949 (brackets in original). The district court dismissed the suit without addressing whether the plaintiffs' liquor license was property, instead holding that there was no actual deprivation by the village and its officials. *See id.*

On appeal, the Seventh Circuit provided a thorough discussion as to whether an Illinois liquor license is property for purposes of the

Fourteenth Amendment. *See id.* at 948. At the outset, the court noted that since the Supreme Court's decision in *Board of Regents v. Roth,* 408 U.S. 564, 567, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), state law provided the answer to that inquiry. *See id.* In *Roth,* the Court stated:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate expectation of entitlement to it. . . . Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

408 U.S. at 577, 92 S.Ct. 2701.

The *Reed* court, however, rejected the notion that the state law apparently on point here, *i.e.,* the Liquor Control Act's statement that a liquor license is "purely a personal privilege," is controlling for due process purposes. *See Reed,* 704 F.2d at 948. Specifically, the court remarked, " '[p]roperty' in the Illinois Liquor Control Act need not mean the same thing as 'property' in the due process clause." *Id.* (*citing Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)). While acknowledging that an Illinois liquor license does not have some of the typical attributes of property such as alienability, the court stated that it "must look beyond labels ... and decide whether the plaintiffs' license was 'property' in the functional sense." *Id.* Accordingly, the court posed the dispositive question as "whether under Illinois law a liquor license is securely and durably the licensee's" as opposed to "what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain." *Id.*

The court answered the former query in the affirmative. *See id.* First, the court reasoned that an Illinois liquor license "is good for one year and during that time, clearly, it is securely held, for it can be revoked only for cause, after notice and hearing, and subject to judicial review." *Id.* Second, the court found that "the criteria for renewal of a [liquor] license are undemanding, which suggests that the Illinois legislature expected most licenses to be renewed as a matter of course." *Id.* at 948–49 (*referring to* 235 ILCS 5/6–1). Based on this reasoning, the court equated nonrenewal of a license with revocation, *see id.* (*citing City of Wyoming v. Liquor Control Comm.,* 48 Ill. App.3d 404, 6 Ill.Dec. 258, 362 N.E.2d 1080, 1084 (Ill.App.1977)), and stated that the plaintiffs were entitled to "the same safeguards against arbitrary nonrenewal as the [Liquor Control Act] provides against arbitrary revocation." *Id.* Thus, the court concluded that the plaintiffs' "interest in renewal [was] a property right for purposes of the Fourteenth Amendment." *Id.*

While the analysis in *Reed* is instructive, whether a liquor licensee is deprived of a property right when a targeted referendum voids it under the Liquor Control Act was not at issue. As the City suggests, that may provide significant grounds to distinguish *Reed,* which involved the unexpected nonrenewal of a license. (See Defs.' Resp. at 3–4.) Indeed, while N & N likely expected the administrative renewal of its liquor license, it was nevertheless on notice that its license was subject to being void by referendum under the Liquor Control Act. This weighs against concluding that a liquor licensee has a legitimate claim of entitlement, or property interest, in its license. In other words, the ever-present threat of a local option referendum in the Liquor Control Act casts doubt on whether a liquor license is "securely and durably the licensee's." *See Wilcox v. Miller,* 89 C 20053, 1990 WL 304268, at *3 (N.D.Ill. Nov.6, 1990) (construing *Reed* to state that the "expectation of renewal creates a 'vested right' in that license which is entitled to due process protection."); *Schechter v. Village of Niles,* 86 C 4683, 1987 WL 18547, at *3 (N.D.Ill. Oct.9, 1987) (same); *cf. Ross v. City of Chicago,* 89 C 8049, 1990 WL 37700, at *3 (N.D.Ill. March 22, 1990) (no unconstitutional taking where local option referendum voided liquor license because the plaintiff "operated his liquor store with the knowledge that a local referendum could take away his liquor license at any time."); *M & F Supermarket, Inc. v. Owens,* 997 F.Supp. 908, 913 (S.D.Ohio 1997) (local option refer-

endum did not violate plaintiff's substantive due process rights because plaintiffs "knew or should have known that the citizens had this option under the laws of the State of Ohio.").

The court now turns to *Philly's,* a case that involves facts comparable to the ones at bar. In *Philly's,* a Chicago restaurant lost its liquor license as a result of a referendum banning the sale of alcohol throughout the entire, surrounding precinct. *See* 732 F.2d at 89. The restaurant then filed suit, alleging that "the operation of Illinois' local-option liquor law ... allow[ing] the voters in a precinct to vote the precinct dry, deprived [them] of property without due process of law ...." *Id.* For reasons not reiterated in the Seventh Circuit's opinion, the district court dismissed the action on summary judgment. *See id.*

The Seventh Circuit affirmed, holding that a referendum which regulates the sale of liquor precinct-wide does not violate due process. *See id.* at 92–93. Because the court ultimately concluded that the local option referendum satisfied the process prong of the due process inquiry, it expressly declined to decide whether a liquor license is property in these circumstances. *See id.* at 91. Before refraining from this determination, however, the court characterized *Reed* as holding that an Illinois liquor license is property within the meaning of the Fourteenth Amendment. *See id. (citing Reed,* 704 F.2d at 948–49). Moreover, the court stated that to determine whether an Illinois liquor license is property, an inquiry into "the precise dimensions of the right" is also required. The court deemed the expiration date of the liquor license as one of these dimensions, commenting:

> Every liquor license in Illinois has a variable expiration date: either the date stamped on the license or the date on which the licensee is required to surrender the license because the precinct where the licensed premises are located has voted to go dry— whichever is earlier. Just as a tenant is not deprived of a property right when he is ejected from the premises at the expiration of his lease, so it can be argued that when a precinct votes itself dry any liquor licensees' property rights

are extinguished by the terms of the licenses.

*Id.* at 90–91. Additionally, the court acknowledged the possibility that "a liquor licensees' rights are merely conditional on the voters' not voting the precinct dry." *Id.* at 91. Though not controlling, this dicta suggests that the Seventh Circuit would not consider a liquor license property when the license is subject to deprivation via referendum. In sum, the court finds that the decisions from *Reed* and *Philly's* are simply not conclusive as to whether a local option referendum deprives a liquor licensee of "property" as opposed to a mere privilege.

On the other hand, several courts, including this one, have determined that a liquor license is a mere privilege. *See Sapir v. City of Chicago,* 749 F.Supp. 187, 190 (N.D.Ill. 1990) (Norgle, J.) (relying on the language of the Illinois Liquor Control Act and *Ole, Ole* ); *Blue Cat Lounge, Inc. v. License Appeal Comm.,* 281 Ill.App.3d 643, 217 Ill.Dec. 465, 667 N.E.2d 554, 557 (Ill.App.1996); *Roach Enterprises v. License Appeal Comm.,* 277 Ill.App.3d 523, 214 Ill.Dec. 85, 660 N.E.2d 276, 282 (Ill.App.1996); *County of Cook v. Kontos,* 206 Ill.App.3d 1085, 152 Ill.Dec. 7, 565 N.E.2d 249, 252 (Ill.App.1990); *Ole, Ole, Inc. v. Kozubowski,* 187 Ill.App.3d 277, 134 Ill.Dec. 895, 543 N.E.2d 178, 181 (Ill.App. 1989); *Ross v. Kozubowski,* 182 Ill.App.3d 687, 131 Ill.Dec. 248, 538 N.E.2d 623, 626 (Ill.App.1989); *Black Knight Restaurant, Inc. v. City of Oak Forest,* 159 Ill.App.3d 1016, 111 Ill.Dec. 863, 513 N.E.2d 109, 111 (Ill.App.1987); *Two Kats, Inc. v. Village of Chicago Ridge,* 147 Ill.App.3d 440, 101 Ill. Dec. 1, 497 N.E.2d 1314, 1315 (Ill.App.1986); *Duncan v. Marcin,* 82 Ill.App.3d 963, 38 Ill.Dec. 422, 403 N.E.2d 653, 656 (Ill.App. 1980); *City of Wyoming v. Liquor Control Commission of Illinois,* 48 Ill.App.3d 404, 6 Ill.Dec. 258, 362 N.E.2d 1080, 1082 (Ill.App. 1977); *Huguley v. Marcin,* 39 Ill.App.3d 230, 349 N.E.2d 564, 566 (Ill.App.1976); *Malito v. Marcin,* 14 Ill.App.3d 658, 303 N.E.2d 262, 265 (Ill.App.1973); *Maywood Proviso State Bank v. City of Oakbrook Terrace,* 67 Ill. App.2d 280, 214 N.E.2d 582, 586 (Ill.App. 1966); *cf. Great Atlantic & Pacific Tea Co. v. Mayor and Commissioners of Danville,* 367 Ill. 310, 11 N.E.2d 388, 392 (Ill.1937)

("The right to engage in the liquor traffic is not an inalienable right guarded by the organic law."); *People v. McBride*, 234 Ill. 146, 84 N.E. 865 (Ill.1908) (stating that licenses to sell liquor create no vested rights and "are merely temporary permits to do what would otherwise be an offense against the law ....").

With the possible exceptions of *Ole, Ole* and *Black Knight*, however, none of these cases provides much analysis as to whether a targeted local option referendum under the Liquor Control Act deprives the licensee of "property" within the meaning of the due process clause of the Fourteenth Amendment. Even in *Ole, Ole*, the court simply states in conclusory fashion that the proposition that a liquor license is a privilege is "not dependent upon the factual circumstances ...." Rather, it is fundamental statutory law promulgated pursuant to the broad regulatory authority granted to individual states to regulate the liquor industry within their borders. *Ole, Ole*, 134 Ill.Dec. 895, 543 N.E.2d at 181. The court then reviewed the holding in *Philly's* and found the plaintiff's reliance on it misplaced. *See id.* at 181–82. The analysis in *Black Knight* is similarly limited, rejecting the plaintiff's reliance on *Reed. See* 111 Ill.Dec. 863, 513 N.E.2d at 108–9.

Nonetheless, the court finds it difficult to ignore this long, uninterrupted line of decisions, and the express language of the Liquor Control Act stating that a liquor license is a mere privilege. Moreover, the Twenty–First Amendment recognizes[4] that states have an important interest, and wide latitude, in exercising their police powers to control the sale of liquor. *See California v. LaRue*, 409 U.S. 109, 114–15, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972); *Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S. 324, 330, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964); *Marusic Liquors, Inc. v. Daley*, 55 F.3d 258, 261 (7th Cir.1995); *Philly's* 732 F.2d at 93; *United Beverage Co. of South Bend v. Indiana Alcoholic Beverage Commission*, 760 F.2d 155, 159 (7th Cir.1985); *37712, Inc. v. Ohio Dept.*

*of Liquor Control*, 113 F.3d 614, 618 (6th Cir.1997); *Replogle v. Commonwealth*, 514 Pa. 209, 523 A.2d 327, 330 (Pa.1987). *But cf. 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 514–16, 116 S.Ct. 1495, 1514, 134 L.Ed.2d 711 (1996) (stating that the Twenty–First Amendment " 'does not license the States to ignore their obligations under other provisions of the Constitution.' ") (*quoting Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 712, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984)).[5] That said, the court must still determine whether there is a reasonable chance that N & N can show that a liquor license is a property interest when deprived by a local option referendum pursuant to the Liquor Control Act.

Initially, the court notes that from the government's perspective "[a] license is nothing but a promise by the issuing body not to interfere in business according to its terms." *Nat'l Paint & Coatings Assoc. v. City of Chicago*, 45 F.3d 1124, 1129 (7th Cir.1995) (*citing River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 166 (7th Cir.1994)); *see also Toulabi v. United States*, 875 F.2d 122, 125 (1989). The government's decision not to intervene, however, is not to be confused with the property itself. *See River Park, Inc.*, 23 F.3d at 166. Some government promises are considered property merely to insure that "the arbitrary power of petty bureaucrats" is kept in check and to insure that due process is supplied accordingly. *Id.*

Although " 'property' has never had a single, fixed meaning," *Patterson v. Portch*, 853 F.2d 1399, 1404 (7th Cir.1988), the Seventh Circuit has articulated essentially the same test for determining whether a property interest exists for purposes of the due process clause of the Fourteenth Amendment. *See Mid–American Waste Systems, Inc. v. City of Gary, Ind.*, 49 F.3d 286, 289 (7th Cir.1995). In short, Seventh Circuit cases discussing "property" reflect "efforts to implement the conclusion in *Roth*, 408 U.S. at 577, 92 S.Ct.

---

4. Section 2 of the Twenty–First Amendment provides:

    The transportation or importation into any State ... for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.
    U.S. Const. amend. XXI, § 2.

5. For a brief history of liquor control by the states, see Mihir A. Munshi, *Share the Wine—Liquor Control in Pennsylvania: A Time for Reform*, 58 U. Pitt. L.Rev. 507, 508–512 (Winter 1997).

2701, that 'property' depends on a legitimate claim of entitlement." *Id.* For instance, a 1987 case states, that "[t]he question of whether an individual has a property interest in a government benefit depends upon whether the person is entitled to the benefit." *Baja Contractors, Inc. v. City of Chicago,* 830 F.2d 667, 676 (7th Cir.1987). Another case puts it somewhat differently, stating that "the 'property interest' is established by the substantive criteria of the statute." *Scott v. Village of Kewaskum,* 786 F.2d 338, 340, 341 (7th Cir.1986). In *Toulabi,* the court puts it succinctly, "[f]or constitutional purposes an entitlement depending on substantive criteria is 'property.'" 875 F.2d at 125. Most relevant here, the *Reed* court states that the test entails assessing whether the alleged property is 'property' in the functional sense, *i.e.,* whether it is securely and durably the licensee's under state law "as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain ...." 704 F.2d at 948. With these principles in mind, the court turns to whether there are sufficient indicia that N & N's liquor license is property to allow the entry of a preliminary injunction.

At the outset, the court reiterates that an Illinois liquor license lacks some of the typical attributes of property in that it "shall [not] be subject to attachment, garnishment, or execution, nor shall it be subject to attachment, garnishment or execution, nor shall it be alienable or transferable, voluntarily or involuntarily, or subject to being encumbered or hypothecated." 235 ILCS 5/6–1. Moreover, a liquor license cannot be bequeathed, nor can it descend by the laws of intestate. *See id.* Finally, an Illinois liquor license is site-specific, in that it "applies only to the premises described in the application and in the license issued thereon ...." 235 ILCS 5/7–14.

Nonetheless, the court must look further, and determine whether a liquor license is "securely and durably the licensee's." *Reed,* 704 F.2d at 948. As the *Reed* court noted, a license is generally good for one year after issuance, and revocation must be for cause, after notice and hearing, and subject to judicial review; renewal is a matter of course. 704 F.2d at 948–49; *see also* 235 ILCS 5/6–1, 5/7–5. On the other hand (and perhaps ultimately dispositive), the liquor license is not "securely and durably" the licensee's because the Liquor Control Act allows revocation (the statute uses the term "void") via local option referendum at an earlier date than the one-year otherwise provided. *See Philly's,* 732 F.2d at 90–91; *see also* 235 ILCS 5/9–2. Additionally, the Liquor Control Act provides that failure to provide notice of the election where a local option referendum is on the ballot shall not affect its validity or binding force. *See* 235 ILCS 5/9–5. It is unclear, however, whether the Liquor Control Act requires the same pre-deprivation hearing for a revocation by referendum as it requires for a revocation for cause. *Compare* 235 ILCS 5/7–5 ("[N]o such license shall be revoked or suspended ... except after a public hearing by the local liquor control commissioner with a 3 day written notice to the licensee affording the licensee an opportunity to appear and defend.") *with* 235 ILCS 5/9–11 (barring reconsideration of the prohibition for another 47 months).

■ Although there are significant indications that an Illinois liquor license is a mere privilege, the court declines to reach that conclusion at this stage. For now, the court finds that there are at least arguable grounds to conclude that a liquor license is property for purposes of a preliminary injunction. The Seventh Circuit's decision in *Reed* provides at least some authority to reach this conclusion. *See also Kelly v. City of Chicago,* 4 F.3d 509, 511 (7th Cir.1993) (suggesting, without discussion, that a liquor license is property); *Greco v. Guss,* 775 F.2d 161, 170 (7th Cir.1985) (same); *Philly's,* 732 F.2d at 90 (arguably citing *Reed* for the conclusion that a liquor license is always property); *87 South Rothschild Liquor Mart,* 752 F.Supp. at 842 (implicit in district court's decision is that an Illinois liquor license was property). Outside of the potential for a local option referendum, a licensee can lose its Illinois liquor license only for cause, and is protected against arbitrary attempts to revoke or suspend it. *See Reed,* 704 F.2d at 948–49; *see also Sea Girt Restaurant and Tavern Owners Assoc.,* 625 F.Supp. 1482, 1486–88 (D.N.J. 1986), *aff'd,* 802 F.2d 445 (3rd Cir.1986); *cf. Baer v. City of Wauwatosa,* 716 F.2d 1117, 1122 (7th Cir.1983) ("A license to operate a

business is therefore property if it cannot be taken away from the holder before the end of a definite period without proof of misconduct on his part"). Further, a licensee applies, and pays, for its license. *See* 235 ILCS 5/7–1, 5–3. This indicates that the right to sell liquor is commercially limited and valuable, in that it allows a licensee to sell alcoholic beverages. *See In re Terwilliger's Catering Plus, Inc.*, 911 F.2d 1168, 1171 (6th Cir.1990) (liquor license under Ohio law); *Burns Harbor Fish Co. v. Ralston*, 800 F.Supp. 722, 729 (S.D.Ind.1992) (finding that an Indiana fishing license was property). Finally, "[l]icenses have been frequently held to create protectable property interests for the licensees that hold them." *Ralston*, 800 F.Supp. at 729 (citing cases that address various types of licenses). Based on these factors, the court preliminarily finds that N & N may have a property interest in its liquor license.[6]

### 2. *What Process is Due*

Assuming that N & N has a property interest in its liquor license, the court now turns to whether the local option referendum under the Liquor Control Act satisfies due process.

Due process essentially requires notice and an opportunity to be heard. *See Gosnell v. City of Troy*, 59 F.3d 654, 658 (7th Cir.1995). However, "[d]ue process, the Supreme Court has repeatedly written, is a flexible concept that varies with the particular situation." *Doherty*, 75 F.3d at 323 (citing *Zinermon v. Burch*, 494 U.S. 113, 127, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). "[T]he formality of the process varies with the importance of the interest at stake." *Scott v. Village of Kewaskum*, 786 F.2d 338, 341 (7th Cir.1986).

Because "the sale of liquor has been subjected to special controls for a long time ... these controls may reduce the private interest at stake." *Id.* Indeed, "local voters possess a legitimate interest in regulating the types, modes, and circumstances of alcohol sales in their neighborhood." *See 37712, Inc.*, 113 F.3d at 620. Therefore, a liquor

licensee may not be entitled to much process before the state deprives it of its license. Here, the Liquor Control Act provides at least some process. For instance, the Liquor Control Act allows a licensee to challenge the petitions required for the placement of a referendum on the ballot. *See* 235 ILCS 5/9–4. Additionally, a threatened licensee can potentially recruit five sympathetic voters within the precinct to challenge the election in which the referendum was passed. *See* 235 ILCS 5/9–19. Given that only a liquor license is at stake, this process is arguably sufficient. *See Gosnell v. City of Troy, Ill.*, 59 F.3d 654, 658 (7th Cir.1995) ("The opportunity to complain to the state court supplied all the process due under the circumstances.").

Nevertheless, N & N argues that the Liquor Control Act violates its due process rights because the local option referendum targets single licensees for revocation without providing adequate safeguards. In support of its argument, N & N primarily relies on dicta in *Philly's* and Judge Aspen's holding in *87 South Rothschild*. In response, the City attempts to distinguish *Philly's* and *Rothschild*, and contends that the referendum "contained safeguards that ensured due process." (Def.'s Resp. at 2.) The City asserts that "there were three kinds of safeguards against arbitrariness here: the referendum was legislative in character, imposed costs upon the voters, and was conducted with notice and opportunities to challenge the proposition." (*Id.* at 11.) Though the City's latter arguments carry some weight, the court agrees with N & N that the reasoning in *Philly's* is applicable here; we therefore follow *Rothschild* and conclude that the targeted nature of the local option referendum does not likely pass constitutional muster.

In *Philly's*, the Seventh Circuit upheld the constitutionality of a previous version of the Liquor Control Act. 732 F.2d at 93. Specifically, the court held that a local option referendum banning the sale of liquor throughout a Chicago precinct was a "constitutionally permissible method of regulating the local

---

**6.** For an excellent discussion on whether a liquor license is entitled to constitutional protection as a property interest, see Shelly Ross Saxer, *License to Sell: Constitutional Protection Against* *State or Local Government Regulation of Liquor Licensing*, 22 Hastings Const. L.Q. 441 (Winter 1995).

sale of liquor." *Id.* at 94. The court reached this conclusion, however, only after discussing the value and validity of a referendum in a democracy. *See id.* at 91–92.

At the outset, the court noted that because the Constitution reflects distrust for majority rule, "there is greater cause to distrust lawmaking by referendum." *Id.* at 91. As the court explained, "[v]oters, even more obviously than legislators, are not judges, are guided by no standards, do not give reasons for their decisions, and are not subject to judicial review." *Id.* Nonetheless, the court stated that it does not necessarily follow that a referendum violates due process. *See id.* (*citing City of Eastlake v. Forest City Enterprises, Inc.,* 426 U.S. 668, 678–79, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976)). In fact, the court acknowledged that a referendum "used to decide whether liquor may be sold in a particular area ... is a pragmatic as well as venerable response to the social problems created by the sale and consumption of liquor." *Id.* at 92. The court then discussed whether a referendum banning the sale of liquor precinct-wide violated due process. *See id.* at 92–93.

Because the following passage from *Philly's* is particularly instructive here, this court excerpts it in its entirety:

> Whether a particular procedure for deciding a question is "fair" depends on the nature of the abuse that the procedure is designed to prevent. Usually it is designed to prevent a mistaken application of law. *See, e.g., Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). That is not the problem here. The concern is not that the voters of a precinct might make a mistake in deciding to ban the retail sale of liquor; when they vote on the question they are voting their personal values and there is no criterion by which a court or other outsider could judge their decision correct or incorrect. The concern is that the voters might "gang up" to drive out of business a seller of liquor whom they disliked for reasons unrelated to any plausible public interest. This is a distinct type of arbitrary action that the requirement of fair procedure is designed to prevent, or at least make less likely to occur. *See* Tribe, American Constitutional Law 503–04 (1978). It is therefore rele-

vant to point out that the Illinois act does not permit the precinct's voters to single out a particular liquor seller to shut down. *Compare Larkin v. Grendel's Den, Inc.,* 459 U.S. 116, 124–26, 103 S.Ct. 505, 511, 74 L.Ed.2d 297 (1982). The precinct can choose only between allowing and not allowing the retail sale of alcoholic beverages. *See* Ill.Rev.Stat.1981, ch. 43, ¶ 171. The voters must shut down all the retail liquor outlets in the precinct in order to shut down one and they must shut them down for four years because a new referendum cannot be held before that period has elapsed. *Id.,* ¶ 175. This means not only that the licensee who is disliked is protected to some extent by the licensee who is liked but also that the voters cannot impose costs on liquor sellers without imposing costs on themselves—the costs of not being able to buy liquor in the precinct. The requirement that the precinct electorate act across the board shows that the judgment the voters are asked to make is legislative rather than adjudicative in character .... And notice and opportunity for a hearing are not constitutionally required safeguards of legislative action. *Bi–Metallic Investment Co. v. State Bd. of Equalization,* 239 U.S. 441, 445, 36 S.Ct. 141, 142, 60 L.Ed. 372 (1915); *Association of Nat'l Advertisers, Inc. v. FTC,* 627 F.2d 1151, 1165–66 (D.C.Cir.1979). The fact that a statute (or statutelike regulation) applies across the board provides a substitute safeguard. *See United States v. Florida East Coast Ry.,* 410 U.S. 224, 245–46, 93 S.Ct. 810, 821, 35 L.Ed.2d 223 (1973). This safeguard is built into Illinois' local option provision, and supplies a practical reason for classifying the referendum procedure as legislative for purposes of this case.

*Id.* at 92–93. Primarily because the "across the board," or legislative, nature of a precinct-wide liquor ban, the court concluded that the local option referendum contained adequate safeguards to satisfy due process. *See id.* at 93.

In *Rothschild,* the court relied on the dicta in *Philly's* to find the local option provision of the Liquor Control Act unconstitutional on

due process grounds. *See* 752 F.Supp. at 841–42. In that case, the Board of Election Commissioners of the City of Chicago sought to place a referendum on the ballot which would allow voters to decide whether to prohibit liquor sales at a particular address. *See id.* at 840–41. The court held that a referendum targeting a specific address was unconstitutional. *See id.* at 841, 842. Further, the court emphasized that where voters elected to shut-down a specific liquor seller, the safeguard of a precinct-wide prohibition was missing. *See id.* at 842. Most notably, the court equivocated the targeting of a single licensee with the unconstitutional "ganging up" of the electorate referred to by the *Philly's* court. *See id.*

■ This court finds the facts in *Rothschild* indistinguishable, and likewise declines to depart from the Seventh Circuit's instructive reasoning in *Philly's*. Though dicta, that reasoning indicates that the court of appeals would conclude that a targeted referendum such as the one at bar violates due process. While the Seventh Circuit has not since had the opportunity to address a targeted referendum, it has emphasized that only "across the board" legislation is constitutionally permissible. *See, e.g., Marusic Liquors, Inc.,* 55 F.3d at 262 ("class-wide" legislation satisfies due process); *Coniston Corp. v. Village of Hoffman Estates,* 844 F.2d 461, 469 (7th Cir.1988) ("The smaller the class affected by a nominally legislative act, the weaker the democratic check . . . ."); *see also Hoffman v. City of Warwick,* 909 F.2d 608, 619–20 (1st Cir.1990); *Burns,* 800 F.Supp. at 730–31. As the *Rothschild* court noted, there is otherwise great potential for voters to "gang up" and target a local business for reasons unrelated to the public interest. *See* 752 F.Supp. at 841; *see also Marusic Liquors, Inc.,* 55 F.3d at 262 (noting that "direct elections . . . are more prone to decision by passion or prejudice—as Socrates learned."); *United Beverage Co. of South*

*Bend v. Indiana Alcoholic Beverage Commission,* 760 F.2d 155, 159 (7th Cir.1985) ("State or local referenda are sometimes attacked as improper, standardless, delegations of legislative power."). In short, the local option referendum is adjudicative in nature by lacking the "across the board" safeguard that the *Philly's* court found necessary. *See Brookpark Entertainment, Inc. v. Taft,* 951 F.2d 710, 716–17 (6th Cir.1991) (finding Ohio local option law that allowed specific addresses to be targeted unconstitutional); *Hoffman v. City of Warwick,* 909 F.2d 608, 619–20 (1st Cir.1990); *Burns,* 800 F.Supp. at 730–31. On this ground, the court concludes that N & N's due process claim has "at least a better than negligible chance" of succeeding on the merits.[7]

### C. Inadequate Remedy at Law / Irreparable Harm

■ N & N must next establish that it has an inadequate remedy at law and that it would suffer irreparable harm if a preliminary injunction does not issue. These two elements are often merged because they involve the same analysis. *See, e.g., Meridian Mut. Ins. Co.,* 128 F.3d at 1120. N & N claims that the enactment of the referendum will irreparably tarnish its business reputation and goodwill. Further, N & N claims that the approaching holiday season is the busiest time of the year in the beverage alcohol industry. Though N & N fails to elaborate on the nature of its business (beyond that it sells alcohol at retail for on-premises consumption), the court finds that N & N has an inadequate remedy at law and may suffer irreparable harm by the operation of the referendum. It is difficult to discern how N & N could obtain relief outside the enjoinment of the referendum; an attempted buy-out by the City does not appear possible. Moreover, the referendum will immediately halt N & N's alcohol sales at the Amphithea-

---

7. The court notes that the "sports facilities" exemption under the Liquor Control Act does not apply here. *See* 235 ILCS 5/9–2a. That provision states that the local option provision allowing precinct voters to ban alcohol sales does not apply to: (1) any new sports facility owned by any unit of local government and constructed after July 7, 1988; (2) any new stadium described in subsection (a) of Section 10–215 of the Property Tax Code; or (3) a sports stadium having more than 15,000 but less than 50,000 seats in any municipality having more than 2,000,000 inhabitants. At a hearing on November 30th, the court asked counsel whether subsection (3) would be applicable to the Amphitheatre. *See id.* N & N's counsel conceded that the Amphitheatre has a seating capacity of less than 15,000.

tre at what is allegedly the most crucial part of the year. Even though N & N's due process claim does not appear strong, there is great potential for N & N to suffer irreparable harm in the absence of a preliminary injunction. Whether N & N satisfies these elements for purposes of a permanent injunction has yet to be seen.

### D. Balancing of Harms / Public Interest

 Having determined that N & N will suffer irreparable harm in the absence of a preliminary injunction, the court must balance that harm against the harm the City, or more specifically the residents of the 35th precinct, will allegedly suffer if a preliminary injunction is granted. The court concludes that the residents' potential harm pales in comparison to N & N's. N & N claims to have been selling alcohol at the Amphitheatre for several years without interference. Residents of the 35th precinct have tolerated alcohol sales at the Amphitheatre during those years, and likely since the Amphitheatre was first opened; it was only in 1998 that residents of the 35th precinct exercised their voting rights under the Liquor Control Act. Further, other retail liquor establishments within the 35th precinct will continue to operate even if the referendum is enforced against N & N. Additionally, there is nothing in the current record to suggest that there have been any disturbances in the neighborhood due to the sale of alcohol at the Amphitheatre. Many Amphitheatre patrons no doubt imbibe alcoholic beverages at the venue without later engaging in anti-social activity. In sum, the court finds that the potential harm to N & N's business outweighs the potential harm to area residents and the public at large.

### III. CONCLUSION

For the foregoing reasons, the court concludes that N & N is entitled to a preliminary injunction. The City is temporarily enjoined from enforcing the results of the November 3rd local option referendum that sought to ban alcohol sales at the Amphitheatre. By separate order, the court will schedule a hearing where it will hear arguments on whether a permanent injunction is warranted.

IT IS SO ORDERED.